**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **LINDA FLOREK,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **No.  05 C 6402** |
| **VILLAGE OF MUNDELEIN;** ) | |
| **POLICE SGT.  DONALD HANSON;**[1] ) | |
| **POLICE OFFICERS STEVEN** ) | **Magistrate Judge Maria Valdez** |
| **SCHAEFER, JUAN GUZMAN, P.** ) | |
| **AHERN, AARON WERNICK,** ) | |
| **BRIAN WAINSCOTT; OFFICER** ) | |
| **KAPLAN; OFFICER PERDUE; and** ) | |
| **POLICE CHIEF RAYMOND ROSE,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Linda Florek brings this complaint pursuant to 28 U.S.C. § 1983 alleging her Fourth and Fourteenth Amendment rights were violated in connection with a search and arrest made by certain members of the Village of Mundelein, Illinois Police Department.  The complaint also alleges state law claims of unlawful detention, abuse of process, and failure to provide medical care.  This matter is now before the Court on Defendants' Motion for Summary Judgment [Doc. No. 45].  For the reasons that follow, the motion is granted in part and denied in part.

---

[1]  In the body of Defendants' motion, the sergeant's name is listed as "Donovan Hansen," but neither party clarifies which name is correct.  In this order, the Court will use the spelling given by Defendants.

<u>**FACTS**</u>[2]

The individual defendants Donovan Hansen, Juan Guzmán, Peter Ahern, Brian Wainscott, Seamus Kaplan, Thomas Perdue, Steven Schaefer, Aaron Wernick, and Raymond Rose were at all relevant times employed by the Village of Mundelein Police Department. (LR 56.1(a)(3) ¶ 3.) Plaintiff Linda Florek was at all relevant times a resident of Mundelein, Illinois. (*Id.* ¶¶ 1, 2.)

On November 30 and December 4, 2004, as part of an investigation into drug activity, two "controlled buys" of cannabis were made by a confidential informant from an individual named Rafael Aguilar. (*Id.* ¶ 4.) The controlled purchases were made at or in front of an apartment located at 543 N. Lake St. in Mundelein, which is Plaintiff's residence. (*Id.* ¶ 5, LR 56.1(b)(3)(B) ¶ 5.) Based upon these controlled purchases, a search warrant for the premises was prepared on December 6, 2004. (LR 56.1(a)(3) ¶ 6.)

On December 7, 2004, the evening the warrant was executed, Plaintiff left work at around 10:00 p.m. and arrived home approximately five minutes later. (LR(b)(3)(C) ¶ 4.) Shortly thereafter, Plaintiff took off her clothes, put on a T-shirt, and went into the living room. (*Id.* ¶ 4.)

The search warrant was executed at 10:22 p.m. (*Id.* ¶¶ 4, 6.) Defendant Hansen supervised the execution of the warrant, and each officer involved received an assigned task or role. (LR 56.1(a)(3) ¶¶ 8, 10.) Defendant Wainscott was assigned to wield the "ram," which is an object used to force open doors; and defendant Kaplan was assigned

_____

[2] Unless otherwise noted, the following material facts are undisputed or are deemed admitted due to a party's failure to comply with Local Rule 56.1, which this Court strictly enforces.

to knock and announce the officers' presence with the verbal warning, "Police Department, search warrant." (*Id.* ¶¶ 11-13.) According to Defendants, the officers waited approximately fifteen seconds after knocking and announcing before Wainscott used the ram to strike the door, forcing it open. (*Id.* ¶ 14.) Plaintiff disputes that a verbal warning was given and claims that she only heard at least four impacts on her door before the officers entered her home. (*Id.* ¶ 15; LR 56.1(b)(3)(B) ¶ 13.)

After the door was opened, the officers on the entry team entered Plaintiff's residence and secured the premises, followed by Hansen. (LR 56.1(a)(3) ¶ 17.) Defendant Schaefer, who was on the entry team, saw Plaintiff standing in the middle of the living room, ordered her to the ground, and applied handcuffs to secure her wrists behind her back. (*Id.* ¶ 18.) The officers smelled the odor of burnt cannabis in the room, and Plaintiff admits that she was smoking a marijuana cigarette when the police broke down her door. (*Id.* ¶ 19; LR 56.1(b)(3)(B) ¶ 19; LR 56.1(b)(3)(C) ¶ 4.) Plaintiff's son Jason, who had been asleep in his bedroom, was also handcuffed and brought into the living room while the bedrooms were searched. (LR 56.1(a)(3) ¶ 20.) During the search, Plaintiff admitted to the officers that she threw a pouch containing cannabis behind the couch as the officers arrived. (*Id.* ¶ 2.) She told them that she had been advised by her physician to smoke marijuana in order to reduce her blood pressure. (*Id.* ¶ 21.) Plaintiff remained seated on the couch and later a chair outside of the bathroom while the apartment was searched. (*Id.* ¶ 22.) Plaintiff was dressed only in a T-shirt and was not allowed to put on jeans for over an hour, although while she was seated on the couch, an officer put a pillow on her lap at her request. (LR 56.1(b)(3)(C) ¶¶ 7-8.)

After Plaintiff moved from the couch to the chair,[3] she asked Hansen if she could take some baby aspirin. (LR 56.1(a)(3) ¶ 24.) Plaintiff had her first heart attack on February 24, 2003 and claims that before she was taken to the hospital on that occasion, paramedics gave her four baby aspirins, nitroglycerin, and started an IV. (LR 56.1(b)(3)(C) ¶ 2.)

Hansen denied her request to take any medication, based upon the provisions of the Police Department's general order 03-05, which governs Medical and Health Care services for prisoners.[4] (LR 56.1(a)(3) ¶ 25.) According to Hansen, he then advised Plaintiff that if she desired medical assistance, the paramedics would be notified, and Plaintiff responded, "This is bullshit." (*Id.* ¶¶ 25-26.) Plaintiff denies that she responded in that manner, claiming that the next thing she said after being denied baby aspirin was to ask for an ambulance. (LR 56.1(b)(3)(B) ¶ 26.) Plaintiff also disputes that Hansen offered to call paramedics at that time; instead, he told her that if she still felt she needed an ambulance once they got to the police station, he would call them. (*Id.* ¶ 25.) Although the timeline of her statements is not entirely clear, Plaintiff testified that she told the officers during the search that she had a heart condition, was having chest pains, was having a heart attack, and she asked for an ambulance. (LR 56.1(b)(3)(B) ¶ 9.)

---

[3] The parties dispute whether she moved to the chair after approximately ten minutes (as Plaintiff claims), or forty to forty-five minutes (as Defendants claim). (LR 56.1(b)(3)(B) ¶ 22; LR 56.1(a)(3) ¶ 22.)

[4] According to the testimony of defendant Rose, the police chief, an arresting officer has no discretion in applying this order and could be subject to discipline for providing aspirin to a detainee. (LR 56.1(b)(3)(B) ¶ 10.)

Hansen testified that Plaintiff did not appear to be suffering from any more stress than a normal person would experience when their residence was the subject of a search warrant. (LR 56.1(a)(3) ¶ 31.) Hansen did not believe that Plaintiff was pale or sweating, based upon his one-time conservation of her, but he did acknowledge that Plaintiff complained of shortness of breath. (*Id.* ¶¶ 33-34.) He believed that the situation resolved itself when she was advised to slow down her breathing. (*Id.* ¶ 33.) Defendants admit that Plaintiff may have advised Hansen of her prior heart attack. (LR 56.1(a) ¶ 9.)

At 11:36 p.m., after the search was completed, (LR 56.1(b)(3)(C) ¶ 6), Plaintiff and her son were driven to the police station in the Department's prisoner transport vehicle, a Chevy cargo van which is custom-partitioned with an interior prisoner transport unit designed to segregated transport of prisoners of opposite sexes and/or juveniles. (LR 56.1(a)(3) ¶¶ 35-36.) Plaintiff and her son testified that after she was placed in the van, she pleaded, "Please don't put me in that cage. I am having a heart attack. I am claustrophobic." (LR 56.1(b)(3)(C) ¶ 12.) Schaefer acknowledged that Plaintiff protested being placed in the van, but he told her that "this was the vehicle that she was going to be going in." (*Id.* ¶ 13.)

According to Defendants, shortly after Plaintiff went into the van, she began experiencing distress and advised the officers in the rear of the van that she was experiencing chest pains.[5] (LR 56.1(a)(3) ¶ 37.) Defendant Perdue, who is also a licensed paramedic, spoke with Plaintiff while she was in the van and advised the driver,

---

[5] Plaintiff denies that her distress only began when she was transported, claiming instead that she advised officers several times while she was in her apartment that she was having a heart attack. (LR 56.1(b)(3)(C) ¶ 37; LR 56.1(b)(3)(B) ¶ 9.)

Hansen, of Plaintiff's distress. (*Id.* ¶ 38.) Hansen then radioed for an ambulance to meet them at the police station. (*Id.* ¶ 39.) The call for the ambulance occurred less than thirty seconds after Hansen began driving to the police station. (LR 56.1(b)(3)(C) ¶ 18.)

The van arrived at the station less than two minutes later, and Mundelein Fire Department paramedics arrived less than three minutes after that. (*Id.* ¶ 18; LR 56.1(a)(3) ¶ 40.) The paramedics' report indicated that Plaintiff was complaining of chest pain, was very anxious, breathing very rapidly, and complaining of dizziness and numbness in her left arm; they administered baby aspirin and one nitro tab before transporting Plaintiff to the hospital approximately fifteen minutes later. (LR 56.1(a)(3) ¶ 41; LR 56.1(b)(3)(B) ¶ 41; LR 56.1(b)(3)(C) ¶ 18.) The paramedics' report on Plaintiff's objective symptomology stated that she was alert, her pupils were equal and reactive to light; her lungs sounds were clear; her skin color, skin moisture, and skin temperature were all normal; her respiratory effort was "labored"; her blood pressure was 130/60, which fell to 100/70 twelve minutes after the paramedics arrived; her pulse was 68; and the cardiac monitor reflected a normal sinus rhythm. (LR 56.1(a)(3) ¶ 42-44.)

Plaintiff arrived at the hospital at 12:02 a.m. on December 8. (LR 56.1(b)(3)(C) ¶ 18.) At 12:23 a.m., Schaefer advised Hansen that Plaintiff had a heart attack.[6] (*Id.* ¶ 18.) Hansen then ordered Schaefer and Perdue to complete Plaintiff's processing (fingerprinting and a recognizance bond), telling them to check first with her doctor to ensure that there was no medical reason not to, and Perdue left for the hospital at 12:35 a.m. (*Id.* ¶ 18; LR 56.1(a)(3) ¶ 45.) According to Plaintiff, the officers asked for her

---

[6] The precise timing of the heart attack is not clear from the parties' submissions.

doctor's permission to fingerprint her, and the doctor believes he said it would be okay. He did not believe they specifically told them what they were going to do, and he did not observe the process. (LR 56.1(b)(3)(B) ¶ 45.) Plaintiff was fingerprinted in the emergency room and given a ticket to appear in court at a later date. (LR 56.1(b)(3)(C) ¶ 18.) Plaintiff was charged with possession of less than 2.5 g of marijuana and ultimately received supervision and paid a fine. (*Id.* ¶ 11.)

The Village of Mundelein's Police Department has received accreditation from the Commission on Accreditation for Law Enforcement Agencies ("CALEA"). (LR 56.1(a)(3) ¶ 27.) As part of the CALEA accreditation process, the Police Department's general orders were reviewed by a team of assessors, and the Department's re-accreditation in 2004 included a requirement that the Department documents that medical professional to review the content of the general order concerning Medical and Health Care services for individuals in police custody. (*Id.* ¶¶ 28-29.) Hansen was the Department's representative who specifically dealt with the compliance verification assessment for the 2004 CALEA re-certification. (*Id.* ¶ 30.)

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all reasonable

inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001).

However, once the movant has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The party opposing summary judgment must offer admissible evidence in support of his version of events. *McKenzie v. Ill. Dep't of Transp.,* 92 F.3d 473, 484 (7th Cir. 1996); *see Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir. 1998) ("'If the non-moving party bears the burden of proof on an issue, . . . that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact.'") (citation omitted). "The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion. . . . The nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'" *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (citations omitted).

Courts ruling on a motion for summary judgment are "not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies." *Pleniceanu v. Brown Printing Co.*, No. 05 C 5675, 2007 WL 781726, at *7 (N.D. Ill. Mar. 12, 2007) (citing *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 898 (7th Cir. 2003)); *see Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005). Similarly, a court is not required to scour the record for facts and arguments supporting the motion. *See Knapp v. County of Jefferson*, No. 06 CV 4028, 2007 WL 496396, at *1 (S.D. Ill. Feb. 13, 2007)

(denying summary judgment where defendant's brief "contains no facts section and . . . fail[s] to point to the relevant portions of the record to establish the facts of this case").

In addition, "[c]onclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact." *Hall v. Bodine Elec. Co.,* 276 F.3d 345, 354 (7th Cir. 2002). Affidavits or depositions based on speculation, rumor, or conjecture are also not sufficient to defeat a properly supported motion for summary judgment. *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 337 (7th Cir. 1991). Finally, the Court is "'not required to draw every conceivable inference from the record.'" *McCoy v. Harrison,* 341 F.3d 600, 604 (7th Cir. 2003) (citation omitted).

## II.    Claims Against Defendant Rose

Defendants first argue that Plaintiff's claims against Defendant Rose, Mundelein's police chief, in his official capacity are effectively claims against the municipality and thus duplicative. A claim against an officer sued under Section 1983 in his or her official capacity operates as a claim against the governmental entity itself. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 n.55 (1978). Because suits against government officials in their official capacity and direct suits against governmental entities are functionally equivalent, there no longer exists a need to bring official-capacity suits against local officials. *See Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985). Plaintiff's claims against Rose in his official capacity are therefore dismissed as redundant of her claims against the municipality.

Defendants next maintain that to the extent Plaintiff may allege an individual claim against Rose,[7] Plaintiff has failed to demonstrate that he was personally involved in the alleged deprivation of her rights: Rose was not present during the execution of the warrant, and did not learn about her medical issues until the next day. "An official meets the 'personal involvement' requirement when she acts or fails to act 'with a deliberate or reckless disregard of plaintiff's rights or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent.'" *Black v. Lane*, 22 F.3d 1395, 1401 (7th Cir. 1994) (citation omitted); *see Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir. 1986). Plaintiff did not respond to Defendant's arguments related to either the official capacity or possible individual capacity claims against Rose. Accordingly, summary judgment is granted in Rose's favor on all claims.

## III.  Fourth Amendment - Unlawful Detention

Defendant's motion states that summary judgment is proper on Plaintiff's claim of unlawful detention because probable cause existed for her arrest. "A law enforcement officer has probable cause to make an arrest when 'the facts and circumstances within his knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense.'" *Jones v. Webb* [hereinafter "*Webb*"], 45 F.3d 178, 181 (7th Cir. 1995) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)) (alteration omitted); *see Silverman v. Ballantine*, 694 F.2d 1091, 1095 (7th Cir. 1982); *see also Mahoney v. Kesery*, 976 F.2d

_____

[7] Paragraph 4 of the complaint states that Rose "is here sued in his official capacity," but paragraph 32 alleges that the acts of the individual officers were committed on Rose's instruction or with his knowledge, consent, and/or approval and ratification.

1054, 1057 (7th Cir. 1992) ("[P]robable cause depends not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer* -- seeing what he saw, hearing what he heard.") (emphasis in original).

It is not disputed that Plaintiff was committing a crime, possession of marijuana, when the officers entered her home and that the police knew she was committing that crime. Thus, there was probable cause for her arrest as a matter of law. Plaintiff's reliance on cases outlining the appropriate scope of detention incident to a search is misplaced. Unlike in those cases, Plaintiff was not merely an occupant of the searched premises but an arrestee. *Cf. Muehler v. Mena*, 544 U.S. 93 (2005); *Michigan v. Summers*, 452 U.S. 692 (1981). Plaintiff has offered no facts demonstrating that her arrest lacked probable cause or was otherwise improper. Summary judgment is therefore granted as to Plaintiff's claim of unlawful detention.

## IV.   Fourth Amendment - Unlawful Search

### A.   Failure to Knock and Announce

Plaintiff alleges that the search was unreasonable because the officers failed to knock and announce their presence before entering her home. "Generally, police officers are required to knock and announce their presence unless there are exigent circumstances." *United States v. Jones*, 208 F.3d 603, 609-10 (7th Cir. 2000) (holding that in the absence of exigent circumstances, officers may forcefully enter if they are refused admittance or a refusal can be inferred by the circumstances).

Defendants argue that "[v]iewing the evidence in the light most favorable to plaintiff," either the banging she heard was the sound of the officers knocking and

announcing, or she cannot offer competent evidence of what the officers said or did before they entered.  (Defs.' Mot. at 7.)  And either way, according to Defendants, there is no genuine dispute of fact as to whether the officers knocked and announced, as they all testified they did.  The Court disagrees.  Truly viewing the evidence in the light most favorable to Plaintiff, as this Court must, there is a disputed issue of fact as to whether Defendants knocked and announced before breaking her door down.  Plaintiff's testimony that she heard nothing before her door was destroyed is not a failure to offer competent evidence.  To the contrary, a reasonable trier of fact could infer that she heard nothing because the officers did not knock and announce their presence at all.

Furthermore, assuming the officers did announce their presence, it is a question of fact whether their fifteen-second wait before breaching the door was reasonable under the circumstances.  *See Jones*, 208 F.3d at 610 ("[T]he period of time that officers must wait before forcible entry is determined by what is reasonable under the circumstances of the particular case.").  Defendants' motion for summary judgment is therefore denied in relation to Plaintiff's Fourth Amendment claim that the officers did not knock and announce before entering the premises.

### B. Unreasonable Force

Defendants maintain that the Fourth Amendment authorizes officers to detain occupants of searched premises while a proper search is conducted, and inherent in this authority is the ability to use reasonable force, such as the application of handcuffs, to effectuate the detention.  The Court finds that the salient issue is not whether the force was reasonable to effect the search; as discussed above, Plaintiff was under arrest, not merely an occupant observing a premises search.  The Court finds that the application of

handcuffs to Plaintiff was not unreasonable. Plaintiff does not allege discomfort or pain caused by the handcuffs or any other methods used to detain her. Plaintiff's discomfort and pain was caused by her medical needs, which she claims were not adequately addressed by the officers. Plaintiff's claims with regard to her discomfort from the detention are more properly addressed in conjunction with her claims of inadequate medical care, *infra*.

Plaintiff has also failed to show that the manner of the search was otherwise constitutionally unreasonable. She argues that her privacy rights were violated because she was dressed only in a T-shirt during the search but acknowledges that an officer covered her lap with a pillow as soon as she requested it. *Cf. Franklin v. Foxworth*, 31 F.3d 873, 875-76 (9th Cir. 1994) (finding the manner of a detention incident to a search to be unreasonable where a disabled man wearing only a T-shirt was carried from his bed, handcuffed, placed on a couch with his genitals exposed and "[n]o effort was made to obtain clothing or any covering for him"). Because there is no genuine issue of material fact, summary judgment is granted as to Plaintiff's claim of unreasonable force in connection with the search.

## V.    Qualified Immunity - Indifference to Medical Needs

With regard to Plaintiff's claims that the officers were not responsive to her medical needs, Defendants assert that they are qualifiedly immune from liability under § 1983.[8] "The doctrine of qualified immunity protects government officials 'from liability

---

[8] Defendants also argue that summary judgment should be granted in favor of defendants Ahern, Kaplan, Wainscott, Wernick, and Perdue because they had no role in any claimed deprivation of Plaintiff's rights. Plaintiff's response does not dispute that these defendants had no personal involvement, and therefore summary judgment is

for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, --- U.S. ---, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) ("Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."). "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson*, 129 S.Ct. at 815. Courts therefore are directed to "'resolv[e] immunity questions at the earliest possible stage in litigation.'" *Id.*; *see Khorrami v. Rolince*, 539 F.3d 782, 787 (7th Cir. 2008).

"The Supreme Court has identified two key inquiries for qualified immunity assertions: (1) whether the facts, taken in the light most favorable to the plaintiffs, show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (citing *Pearson*, 129 S.Ct. at 815-16). Courts may decide the relevant questions in any order. *Pearson*, 129 S.Ct. at 819. In cases where "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," *id.* at 815-16; or when the parties' "briefing of constitutional questions is woefully inadequate," *id.* at 819-20; or where the

---

granted in their favor on all claims. *See Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) ("A plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the unconstitutional actions.") (citation and internal quotation marks omitted).

constitutional question is so fact-specific that it may give little guidance in future cases, *Chaklos v. Stevens*, 560 F.3d 705, 711 (7th Cir. 2009), higher courts have advised that it may not be prudent to address the first question, whether a constitutional right exists.

When a defendant raises qualified immunity, whose purpose "is to protect public officials from guessing about constitutional developments at their peril, the plaintiffs have the burden of showing that the constitutional right was clearly established." *Gonzalez*, 578 F.3d at 540. A "clearly established" right is defined as one whose contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson v. Layne*, 526 U.S. 603, 604 (1999). A plaintiff may demonstrate that a right was clearly established "by showing that there is 'a clearly analogous case establishing a right to be free from the specific conduct at issue' or that 'the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights.'" *Gonzalez*, 578 F.3d at 540 (citations omitted). Plaintiffs, however, are not required to show that the very action in question has been previously held unlawful, "but in the light of pre-existing law its unlawfulness must be apparent." *Wilson*, 526 U.S. at 604.

Defendants argue that their refusal to allow Plaintiff to take baby aspirin and their failure to call an ambulance during the search did not violate a clearly established right. But Defendants' analysis is focused on the deliberate indifference standard discussed in *Farmer v. Brennan*, 511 U.S. 825 (1994), which involved a claim of "deliberate indifference" under the Eighth Amendment. Plaintiff's claims, which are "regarding conditions of confinement for pretrial detainees . . ., who have not yet had a judicial determination of probable cause (a *Gerstein* hearing), are . . . governed by the Fourth

15

Amendment and its objectively unreasonable standard." *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007) (referring to *Gerstein v. Pugh*, 420 U.S. 103 (1975)).

Court are instructed to consider four factors in determining whether a police officer's conduct in relation to an arrestee's medical needs was objectively unreasonable under the Fourth Amendment: (1) "notice of the arrestee's medical need, whether by word . . . or through observation of the arrestee's physical symptoms"; (2) "the seriousness of the medical need," as indicated by whether the plaintiff's complaints "[a]re . . . accompanied by any physical symptoms"; (3) "the scope of the requested treatment," which is balanced on a sliding scale against the second factor, the seriousness of the medical need; and (4) "police interests." *Id.* With these general principles in mind, the Court will address Defendants' claims of qualified immunity in relation to Plaintiff's claims that Defendants violated her civil rights by: (1) refusing to allow her to take baby aspirin while she was in custody in her home; and (2) failing to call an ambulance before she was placed into in the transport van.

First, there is a disputed issue of fact as to whether Defendants were on notice of Plaintiff's medical needs. A jury could reasonably believe Defendants' claim that they observed no symptoms suggesting that Plaintiff's medical condition was serious. *See id.* at 402 (noting that the only objective symptoms that the plaintiff was having an asthma attack were his attempts to control his breathing); *Ashworth v. Round Lake Beach Police Dep't*, No. 03 C 7011, 2005 WL 1785314, at *7 (N.D. Ill. July 21, 2005) (finding that officers were not on notice of arrestee's serious medical needs when he merely told them, "I don't feel good. I need my medicine" without elaboration). But a reasonable jury could find the officers were on notice if it believes Plaintiff's testimony that she told the

officers she had a previous heart attack, chest pain, and trouble breathing, and she requested aspirin and an ambulance.

Second, the seriousness of Plaintiff's medical condition at the time her apartment was being searched is also a disputed question of fact. Under the Fourth Amendment standard, the seriousness of Plaintiff's medical needs "need not, on its own, rise to the level of objective seriousness required under the Eighth and Fourteenth Amendment[s]." *Williams*, 509 F.3d at 403. The Court is therefore not confined to the definition of a serious medical condition as outlined in cases under a due process standard. But those cases can serve as a guide, recognizing that Plaintiff's medical condition need not rise to that level to survive summary judgment.

An objectively serious medical condition has been defined as one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). A medical condition can be considered serious even if it is not life-threatening; it is sufficient that the condition would result in increased pain or further injury if it is not treated. *See Gayton v. McCoy*, 593 F.3d 610, (7th Cir. 2010).

Defendants contend that the paramedics' observations of Plaintiff, showing vital signs within normal limits, "belie any assertion that she was in the throes of a serious medical need." (Defs.' Mot. at 11.) However, the paramedics' findings do not necessarily show that Plaintiff did not have a serious medical need at the time she alleges she first requested aspirin and an ambulance. Depending on the version of events that is credited by the factfinder, the paramedics evaluated Plaintiff anywhere from a lower range of just a few minutes after the onset of her distress to an upper range of nearly an

17

hour or more. Defendants ask the Court to "infer[] that the plaintiff's condition had not 'improved' from the time she had been detained in her apartment until the time the paramedics were called." (Defs.' Mot. at 12.) But, while it may be counterintuitive, it is not wholly unreasonable to infer that her condition *had* improved, which is the contrary inference that this Court must draw in Plaintiff's favor. Furthermore, using Defendants' own logic, the fact that Plaintiff had a heart attack no later than an hour after the search was over (and possibly sooner, although it is not clear from the parties' submissions) could be evidence by which a trier of fact could conclude that Plaintiff did have a serious medical need.

Third, the scope of the requested treatment was not substantial when balanced against the potentially grave seriousness of Plaintiff's medical need. Allowing Plaintiff to ingest some baby aspirin is obviously not difficult, and a reasonable jury could find that calling an ambulance or transporting Plaintiff to the hospital before the search was completed would not have been overly burdensome. *See Paine v. Johnson*, No. 06 C 3173, 2010 WL 669786, at *28 (N.D. Ill. Feb. 22, 2010) (noting that mental health facilities were located two miles and seven miles away from two different police stations, and that "[a] reasonable juror could find that taking [the plaintiff] to a mental health facility for an evaluation would not have been overly burdensome in light of the seriousness of her medical need").

The final factor in the objectively unreasonable analysis is police interests, which are "wide-ranging in scope and can include administrative, penological, or investigatory concerns." *Williams*, 509 F.3d at 403. Defendants do not argue that any police interest was served by their not calling an ambulance to Plaintiff's house when she allegedly

18

requested one. Viewing the facts in the light most favorable to Plaintiff, Defendants failed to call an ambulance when Plaintiff's distress began, and that failure was objectively unreasonable and violated a clearly established right. *See Ashworth,* 2005 WL 1785314, at *7 (finding triable issue of fact as to reasonableness of response where as many as six minutes passed between arrestee's visible signs of discomfort and the officers' call for an ambulance). *Cf. Silverman*, 694 F.2d at 1095 (applying qualified immunity when the evidence indicated officers called for an ambulance "almost immediately upon the recognition that [the decedent] was in need of help" and administered CPR). Because there are numerous disputed issues of material fact, the Court must deny Defendant's motion for summary judgment based on qualified immunity in relation to Plaintiff's claim that Defendants wrongfully failed to call an ambulance. *See Gonzalez*, 578 F.3d at 540 ("When the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial.").

With respect to Plaintiff's claim that she should have been allowed to take baby aspirin, Defendants do make a convincing police interests argument. Much better than their throwaway argument that baby aspirin may be harmful because it can lead to Reye's Syndrome is Defendants' assertion that the officers would have no way of confirming which substance was contained in the aspirin bottle, despite its label. Defendants also claim that Hansen, by following his department's general orders, did not violate clearly established law. The Court agrees that, whether or not Plaintiff has a constitutional right to take unprescribed medication while under arrest, that right is not clearly established and therefore qualified immunity applies. *See Webb*, 45 F.3d at 184 (explaining that "we

19

are concerned with whether the law is clear in relation to the specific facts confronting the [officer] when he acted," and that the inquiry "requires a higher level of specificity" than merely determining that it was clearly established that the use of excessive force would violate the Fourth Amendment). Plaintiff has offered no analogous case to the contrary. Moreover, Plaintiff's experts' opinions that baby aspirin could have and should have been given to her is not relevant to whether the officers' application of the Department's medical policy violated a clearly established right. Summary judgment is therefore granted on the basis of qualified immunity regarding Plaintiff's claim that she was unlawfully denied baby aspirin.

## VI.    **State Law Claims**

Plaintiff failed to respond to Defendants' arguments related to her state law claims of unlawful detention, abuse of process, and failure to provide medical care. Summary judgment is therefore granted in Defendants' favor on all counts.


## **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 45] is granted in part and denied in part. All claims are dismissed against Defendants Ahern, Kaplan, Wainscott, Wernick, Perdue, and Rose. Count II (Pendant State Actions – Unlawful Detention), Count III (Pendant State Actions – Abuse of Process), and Count IV (Pendant State Actions – Failure to Provide Medical Care) are dismissed in their entirety. Count I (Civil Rights) is dismissed as to claims of unlawful detention, unlawful search (unreasonable force), and failure to provide medical care (baby aspirin). The motion for summary judgment is denied as to Count I's claims of unlawful search

(failure to knock and announce) and failure to provide medical care (ambulance), for all remaining defendants.[9]

**SO ORDERED.**

**ENTERED:**

*Maria Valdez*

**DATE:** **March 31, 2010**

HON. MARIA VALDEZ
United States Magistrate Judge

---

[9] Defendants' briefs imply an argument that the Village of Mundelein is not constitutionally liable for its customs, policies, or practices. (*See, e.g.,* Defs.' Mot. at 8 ("For the reasons . . . previously set forth in the Village's arguments regarding the absence of an unconstitutional custom, policy or practice . . . .); *id.* at 9 ("For the same reasons that the order itself did not violate the Constitution, Hanson's conduct [in applying the order is not a violation]."); Defs.' Reply Mem. at 2 ("The first substantive [sic] which was addressed in the defendants' summary judgment pleadings was the entitlement on the part of the municipal defendant, Village of Mundelein, to a Rule 56 judgment on plaintiff's so-called 'civil rights' claims.").) Contrary to the assertion in the reply, Defendants' first argument on summary judgment was that defendant Rose is not liable in his individual or official capacity. The Court could locate no argument in Defendants' motion related to municipal liability, and the extensive argument in the reply brief will not be considered. *See Shlay v. Montgomery*, 802 F.2d 918, 922 n.2 (7th Cir. 1986) ("[I]t is well-established that arguments raised for the first time in a reply brief are waived.").